No. 21-2115, Afor v. Mercy Medical Center. Mr. Agwebu-Istio. Good morning, Judge Kears, Judge Menach, and Judge Koehler. My name is Ike Agwebu, and I appear for the appellant. Today, we have come asking this court to reverse the decision of the district court granting the summary judgment to the appellees and denying the cross-summary judgment motion of the appellant. Counsel, you sent us 5,000 pages of exhibits. I have to confess that I wasn't able to look at each one of them. Could you point me to any place in your filing where you proved the requirements for the FMLA relief? Your Honor, our argument before this court is that we had, in 2017, January 20, come before this court, and after the case was initially dismissed at the district court, and this court decided that Afor had proved a prima facie case of FMLA retaliation. So upon remand, and it was clear because what we faced at that time was that Afor had come before the district court with a claim of FMLA violation, a claim of FMLA retaliation, discrimination. Right, so the panel had decided that she had stated a claim and it shouldn't have been dismissed on a motion to dismiss. Yes. But that's different than surviving a motion for summary judgment. Agreed, but my argument before the court was that at the time, as soon as Afor has proven a case of FMLA retaliation, that applying this court's McDonnell-Douglas shifting framework, the appellees now had the burden to show non-retaliatory reasons for their adverse employment actions, which burden they have failed to carry. claiming that Afor did not qualify for FMLA violation. FMLA violation was never on the table, Your Honor. It was never on the table because by your decision, and I'm reading from your decision, Volume 13, A3155. They took FMLA violation off the table, so it was no longer available to Afor. The only thing that was- Part of making out a claim for retaliation is to show that the plaintiff took advantage of rights under the FLMA, right? Right. So even though the FMLA claim itself was no longer alive, whether she had taken advantage of her rights under the FMLA was still relevant to showing whether there was retaliation, right? I understand that, but- they couldn't have retaliated against her for taking advantage of the FMLA, right? So it's still relevant to the retaliation claim, isn't it? It is, but the hospital was unnoticed. But I would like to point out that this circuit has repeatedly stated that, and that was the language of the decision, she has plausibly alleged that she attempted to exercise FMLA rights. In Collymore and New York City, this court, it was actually Judge Fuller's panel, held that even where a plaintiff was not entitled to- Counsel? Yes. Did this plaintiff, Dr. Offar, inform her employer that her child over 18 needed help because she could not do self-care, which is from the statute, after the birth of her child? Did she ever say that? She did, numerous times. Is it in the record? Yes, it's on record, Your Honor. Could you point me where? You could do it while the other side is making their argument. Yes, I will do that, Your Honor. Thank you. But the more troubling part of the entire thing is that when a police returned to the district and found that they really had no records of false clinical mismanagement, they started manufacturing and fabricating documents to support their position. They started writing up documents to justify- But she did not deny that the records that are there about performance issues and so on would be a non-retaliatory motive for her termination. But your claim relies on the idea that it's fabricated. Yes, they're all fabricated. Because you could see also that there were a lot- She had, prior to the 2012 issue of her vacation, she had a lot of evaluations where she excelled in all the clinical aspects of performance. She was exceptional. She is known in the hospital as an exceptional doctor. She was exceptional. The only time was as soon as she talked about this vacation thing and hired an attorney, suddenly she started having problems. But she started before she hired an attorney, right? So it's June 2012 that she requests vacation time. And then it's August 2012 that this Dr. Capel from Cohen's Children's Hospital contacts the hospital about her performance. And she doesn't hire an attorney about the vacation time until November, right? So the MIDAS report is before she hires an attorney. So you're saying that actually it's just because she requested the vacation time- The MIDAS report is a fraud, Your Honor. What? The MIDAS report is a fraudulent document, and I'll prove it to you, Your Honor. Right, but what I'm saying is it existed before she even hired the attorney. So then you're saying that actually just in response to the request- The request was ongoing, Your Honor. It was when she had difficulties in getting the request through that she now hired an attorney. The request had been ongoing, and there was a refusal before she went ahead to hire an attorney. And I'm glad you mentioned the Exhibit Z. It's a fraudulent document, and I'll tell you why. Dr. Capel that they talked about talked about the treatment of patient number one. Now, patient number one was born on the 11th of August, 2012. Stayed in the hospital for just one day and was transferred to Cohens Children's, LIJ, right? The Exhibit Z, the MIDAS report, the first date on the MIDAS report is July 26, 2012. So patient number one that Capel was referencing was not yet born when the MIDAS report- was not yet born when the MIDAS report's start date. At the start date of the MIDAS report, patient number one was not yet born. Now, again, patient number one had Caucasian parents. The MIDAS report talked about black parents, not Caucasian. The MIDAS report referenced black parents. Also, the MIDAS report that they are talking about talked about a treatment with nebulizer. The patient number one was never treated with nebulizer. Along the line, they switched when we brought all these- They switched and started talking about, oh, we might be referencing patient number four and not patient number one. But Capel never treated patient number four. Patient number four was never transferred to LIJ. And that is just one of the many documents that were submitted to gain an undue advantage in this lawsuit, y'all. We will talk about Exhibit II that they submitted, y'all. This exhibit was the one that referenced dates that were a month after the date of the document. The document referenced dates ahead, like the writer was seeing into the future. It was dated in October, and it was referencing events that occurred in November. How is that possible? If I read from the document, document II, it says dated October 28, 2013, DASH was being treated for apnea brachydia desaturation with GRD. She was diagnosed with GRD on 11-25-2013. Now, it also mentioned certain dates, Monday 11-28. Monday 11-28 was not a Monday. 11-28 was a Thursday, and it was a Thanksgiving Day. These were documents that were prepared after the fact. Okay, I appreciate that we have that argument. You've reserved time for rebuttal. Yes, Your Honor. Counsel, you're going to find a citation for me of where this plaintiff told her employer that she needed FMLA leave, or the substance of that, that her daughter could not take care of herself. Okay? I'll do that. Thank you. Okay, we'll hear from you in rebuttal, but let's turn now to the appellee, Mr. Nottage. Thank you. Good morning, Your Honors. My name is Aaron Nadek, and I represent defendants appellees Mercy Medical Center, Catholic Health Services of Long Island, Swarna Devarajan, and John Riley. Counsel? Yes. This plaintiff worked for this hospital for 12 years before anyone found anything wrong with her. Doesn't it sort of have the aura of retaliation? Well, that's not entirely accurate, Your Honor. In plaintiff's performance reviews, plaintiff was cited numerous times each year from 2006 to 2010 for the same issues that arose with respect to her dealings with other coworkers, her clinical performance, and things of that nature. And then beyond that, the record is chock full of additional evidence concerning Dr. Devarajan's warnings to the plaintiff throughout that time about different issues, and some of them varied, but she was not a stellar employee prior to this incident in 2012. And yet the panel that wrote that summary order was moved by the temporal closeness between this woman hiring an attorney and the beginning of the FPPR. Certainly, Your Honor, and I'm glad you brought that up. Because it highlights the difference between a motion to dismiss and a motion for summary judgment. In fact, the court's previous decision was based on the allegation that she hired an attorney to further her interest in FMLA leave. The evidence did not ferret that out, and in fact, it belied that point. Even plaintiff's lawyer's communications only referenced vacation time. They never referenced the FMLA, never referenced any disability, any medical need for her daughter. They only referenced vacation time, and that's in the appendix. It's A3166 and A2731. Those are two communications from her attorney, and the only communications in the record from her attorney that discuss this need for vacation time, and they do not discuss FMLA at all. I'm sorry. So it's your argument that it's plausible that they did retaliate against her for requesting vacation time, but because it was not a request for FMLA leave, that it's just not connected by the statute? No, the evidence doesn't support that they retaliated against her at all. In fact, the evidence suggests the exact opposite, that these actions were taken for legitimate, non-retaliatory reasons. So it just says that she was a problematic employee for all of those 12 years, but they didn't actually decide to terminate her until after the vacation time request, right? Well, correct, yes. They didn't start to discipline her until Dr. Koppel's complaint. That's when it really came to fruition that they needed to do something about this, and they did the internal investigation, and then from there, they forwarded it to an external three-person investigation, and then put her on an FPPE. So do you have a response to opposing counsel's argument that actually there was no issues with her until she made that request, and so a lot of these documents were fabricated? Yes. In fact, the documents that my brother claims are fabricated are the very documents that are warnings to plaintiff previously that she had performance issues, and I think that's the point of claiming that they're fabricated. It appears to be that everything that's harmful to plaintiff's case is claimed to be fabricated, and these are e-mails and notes to file dated 2009 and dates in that area in which Dr. Deverajan is memorializing her conversations with plaintiff about these same performance issues. So plaintiff's appeals really can be divided up into five categories. Defendant's motion for summary judgment is one. Two is defendant's motion for sanctions on plaintiff's counsel. Three is the motion to compel the medical records, plaintiff's motion to compel medical records on a third party.  And five is plaintiff's motion to strike. The first one and most important one, defendant's motion for summary judgment, there's two procedural issues that I think were raised, the first of which is whether the court's decision on a motion to dismiss precludes a grant of motion for summary judgment. I'm not going to spend a lot of time on that. I don't think that we covered that in our brief, and I don't think that the court is inclined to overturn its well-settled legal standards. The second is whether Judge Hurley was precluded from adopting the report and recommendation. Plaintiff cited no case law on this in her brief, and as indicated in our brief, the statute cited by plaintiff actually supports the opposite, that Judge Hurley could use that report and recommendation. And in any event, Judge Hurley did a de novo review and issued an order. With respect to the merits of the summary judgment motion, the court has a number of options available to it to dispose of this appeal. First is notice. The undisputed evidence establishes that plaintiff sought only to take vacation time. She did not provide adequate notice to take leave for FMLA. It's undisputed that plaintiff's daughter is over 18 years old, and in order to do that, in order to be covered under FMLA, she would have to be incapable of self-care based on a mental or physical disability. To provide sufficient notice of a need for FMLA on that basis, her request had to provide sufficient information to tell Mercy Medical Center that she may qualify for FMLA. Here, it's undisputed that plaintiff never requested FMLA. She never referenced medical leave at all. In September of 2012, she requested vacation time and stated in full, I need the vacation in February because my second daughter is due to deliver her first baby and she will need me. That is it. Isn't that enough to trigger the employer's duty to notify? It's not, Your Honor, and there's plentiful case law that says that it's not. There's the, and we cited it in our briefs, but the Seaman v. CSPH case, the Slaughter v. American Building Maintenance Company case, the Brown v. Pension Boards case, all of those cases say that you have to provide something more than just a general awareness that someone may need you. For example, the Seaman v. CSPH case involved a district court, it affirmed a district court's grant of summary judgment on the ground that plaintiff failed to exercise his rights under the FMLA. Because although he told his employer that he may be suffering from bipolar disorder and needed time off to see a doctor, he did not tell his employer that he was off duty on the dates in question to seek medical attention for that bipolar disorder. Doesn't this statute contemplate an informal give and take where the employer says, why do you think your daughter will need your care? She's after all 28 years old. Doesn't the statute contemplate that? I think that it does, but the employer's burden to follow up starts only, and this is in the statute, it starts only when the plaintiff provides sufficient notice of an FMLA qualifying reason. Once that happens, then absolutely, the employer has an obligation to follow up. But until they cross that threshold of providing- Your position is, so clearly if she had said, my daughter is giving birth, that it would be nice if we were together, the employer wouldn't have an obligation to say, well, why would it be nice? Because she has a medical need. Because it would be nice is not enough to put them on notice. Correct. If she had said, my daughter's giving birth and I need to be there because of her medical needs, that would be enough to put the employer on notice. And you're saying that just saying she will need me is on the first side of the line. That's correct, Your Honor. Yes. Does it mean that the person requesting medical leave has to invoke medical needs? Not necessarily. The person in this instance, this particular instance, and I think it's a very narrow instance, where the FMLA leave is applying not to the person themselves, but instead to an adult daughter. In that particular instance, there has to be sufficient information to say, to suggest that the reason for the leave may be that that person might be incapable of taking care of themselves. It's not, you know, so if you say- Because the statute says incapable of self-care, so it has to be more than just a normal, just regular needs. Correct, Your Honor. Yes. Okay. Could I ask you- And an opposing counsel said that that's in the record, and you're telling us it is not. It is not in the record, Your Honor. There's nothing in the record where she says that. In fact, her email in September was very clear. You know, I just quoted it. Her conversation with Dr. DeVarajan in June of 2012 did not say that she would need time off due to any condition that would make her daughter incapable of self-care. In fact, she, in her deposition, and the district court recognized this, affirmatively disavowed telling Dr. DeVarajan about conditions because she didn't think she believed her. So she said that Dr. DeVarajan had knowledge of her daughter's heart palpitations, heart murmur, and unusual severe anemia, but she didn't say that she needed time off to care for her because of those things. But she said that her supervisor knew about the daughter's problematic history. Right, but she never said that she needed time off to care for her daughter because of those things. Aren't you elevating form over substance? I don't think so, Your Honor. I think that it's very clear that the time off requests had never, she never mentioned that she needed time off to take care of her daughter. So if the employee has a conversation with the employer about the serious medical conditions that her daughter suffered, from which her daughter suffers, and then a week later says to the employer, by the way, I need to take time off to be with my daughter because she's giving birth and she'll need me, wouldn't the employer, shouldn't the employer understand that as need in light of the serious medical conditions that the employee has previously communicated? No, Your Honor. In this instance, the plaintiff informed Dr. Devarajan in June of 2012 that her daughter had heart palpitations, heart murmur, and unusual severe anemia, and never mentioned that she would need time off to care for her because she would be incapable of self-care because of those things. So she explained those things in June of 2012? Yes. Isn't that the same time as the request for vacation time? It was around the same time, yes. So if you have two conversations around the same time, one is my daughter has serious health conditions, and two is I need time off to be with my daughter because she'll need me, why doesn't that put the employer under this? It was June of 2012, and that's nearly seven or eight months before her daughter was going to be delivering this baby, and she said that she didn't know whether or not her daughter would need her at that point in her deposition. She said that the only, I'm just trying to find the excerpt, but in any event, she recognized that it was early in the pregnancy, and she didn't know at that point what medical conditions that her daughter would suffer. She said that in a deposition, but that wasn't part of the request for vacation time? No, the request for vacation time. In June of 2012, she said my daughter has these health conditions, and I need vacation time because she'll need me. Well, the only evidence of that discussion is her deposition testimony, and in her deposition, so it's not exactly clear how the request came out, but yes, that is. Can I ask you about the motion for sanctions on plaintiff's counsel for the HIPAA redaction? Yes. So the HIPAA redactions, even if it's unreasonable, doesn't it really show carelessness or negligence as opposed to bad faith? Like for some of these sanctions, don't you need to show that it was done for the purpose of delay or some improper purpose as opposed to simple carelessness? No, well, Your Honor, yes, but yes, you do need to show bad faith, but I think that the record is very clear that bad faith is established here. Plaintiff's counsel was on notice of the issues regarding the redaction. In fact, defendant's counsel sent him a letter with a proposed redacted amended complaint and told him, we propose filing this, and you could file your full complaint under seal. So you think that the plaintiff's counsel refused to file the redacted complaint because he wanted to delay the procedure? What's the bad faith purpose? What did the plaintiff get out of refusing to do the redactions? It's unclear, Your Honor, but as the district court found, based on the number of times that plaintiff's counsel was told, including by defendant's counsel, defendant's counsel by letter, defendant's counsel filing a motion to seal, plaintiff's opposition, which provided no basis whatsoever for refusing to. What you're saying is that that's unreasonable conduct, but you still haven't shown that it's for the purpose of delay or some other improper purpose, right? I guess you're just saying, well, it's so unreasonable, there must be some improper purpose. Well, and not to avoid that point, but under Rule 11, just filing something that's frivolous is. So under Rule 11, maybe you don't need to show bad faith, but under some of the other standards. Correct. The district court here did say it was for bad faith, and I'm just kind of asking what the improper purpose was. Right. Did it delay the proceedings? I guess it did. I guess there was extra motions practice over this question. Right, right. I mean, it did delay the proceedings. It incurred a significant amount of fees for defendants. It wasted the court's time. And where did the fees come from? So where does the $26,000 figure come from? There was a petition filed with the district court for reasonable attorney's fees. It's my understanding, and I didn't handle the case. So it was attorney's fees in having to deal with the redemptions. Yes, it was attorney's fees in opposing the, in filing the motion for leave to file under seal, opposing and filing the motion for sanctions, and opposing defendants' oppositions to those. Those were both litigated motions. Okay. Counsel, Judge Hurley was pretty forgiving about the errors in the defendants' filings. A misstate, he said here, a one day off doesn't make a difference. But you have to admit that it was awfully sloppy, all the materials that the hospital filed, that they set the date of some meetings were off, was wrong. Maybe by a day, maybe by a month. Yes, Your Honor. All of those errors, though, are explainable, and they're explained in Dr. DeVirajan's affidavits. And that's the only evidence on those points. Other than that, all you have is plaintiff's counsel's argument in his briefs about why these documents should be considered to be fraudulent. There were no, plaintiff's counsel did not take any depositions in this case, including Dr. DeVirajan, for example, who he could have asked about these, he could have asked, you know, about these documents. You know, that's a credibility issue, if anything. And, you know, fraud on the court, as the district court pointed out, is a clear and convincing evidence standard, and plaintiff just didn't establish it. Thank you. Okay, thank you very much, Mr. Nettig. We'll turn back to the appellant on rebuttal. Thank you, Your Honors. Your Honor, the most egregious issues before this court are the numerous documents that were forged and fabricated by the appellees, and I really need to go into a few of them. Because we have four motions for sanctions. One of them was terminated by the district court without consideration. It was fully proofed at that time. More importantly, five of the documents that were included in the motion for summary judgment. Your Honor, counsel, you're arguing that it's more than sloppiness. Oh, yes, Your Honor. It's the way I described it, an excusable error as opposed to counsel. Oh, yes, Your Honor. Exhibit BP that they submitted was a document that had earlier been subject to a motion for sanctions that we had earlier filed in December 5th of 2019. We flagged that document because Dr. DeVarajan wrote in that document an event that never occurred. And in opposition to our motion, she agreed on oath. She admitted on oath that it was a mistake. Then, subsequently, for the motion for summary judgment, the appellees resubmitted this document twice. They resubmitted the document. I filed the first motion for sanctions. Then, later, they resubmitted the document again. And I filed the motion to strike because the document is fraud on its face. There was a conflict. The affidavit of Dr. DeVarajan was in direct conflict with the affidavit of the attorney to the appellees who had sworn to the authenticity of the documents. So they now had affidavits that were counter to each other, and that was not resolved. So Exhibit BP had been submitted earlier and was subject of a motion for sanctions, which the court terminated. That was just one document. In other motions that we had filed, they brought the letters claiming that Dr. Ofo was canceled on a Sunday with a human resources person. That document was reproduced over five times, but that event never happened. When Dr. Ofo, she came to me, she said, oh, how am I ever going to prove that these documents were fraudulent because I no longer work in the hospital? I told her to pray. She prayed, and divinely a message came that she should check the Google Calendar. That's how we found out that this was a Sunday, and we raised it. It was on a Sunday. Do you have a citation for me for where this plaintiff said to her employer that she wants FMLA leave or that her daughter was incapacitated or would be after the birth of her child? Oh, yes. Can you give me a page? Volume 22, A4928. And A4928, lines 11 to 13, volume 19. Wait, that's page A122? Lines 11 through 19? No, page 188, sorry. Lines 11 to 13, volume 19. Page 118? Sorry? What's the page? Page 188, Your Honor. And then lines? Lines 11 to 13, volume 19. 11 to 19 lines? 11 to 13, volume 19, Your Honor. Okay. And then page A4928, volume 22. Say again, what's the page? A4928, rather. Eight? A, A, Apple, Alpha, 4928. Oh, 4928. Volume 22. 4928. These are all the offenders. Yes, Your Honor. The most troubling thing, Your Honor, I think that the court really needs to take a closer look at are the documents that were brought in for the appellants to gain, for the appellees rather, to gain an unfair advantage in the lawsuit. They were fraudulent documents. One had been submitted prior to the summary judgment and was flagged by us. And they admitted in their motion that it was a mistake. And now they reproduced the mistake again, twice, in their motion for summary judgment. That same mistake was reproduced twice. I'm talking about document PP. It's found in A2703 of volume 8. Okay. I think we have that argument. Thank you very much, counsel. Thank you. The case is submitted. Thank you. And because that is the last argued case that we're calling here this morning, we are adjourned. Court is adjourned. Thank you.